per. curiam:
Nos enfrentamos, nuevamente, a una pre-ocupante y recurrente situación a la cual no deberíamos *295 confrontamos con tanta frecuencia, esto es, una actuación del Tribunal de Apelaciones que no solamente es errónea, sino que es claramente contraria a la reiterada jurispru-dencia de este Tribunal.
HH
El Jurado que intervino, como juzgador de los hechos, en el presente caso rindió un veredicto unánime de culpa-bilidad contra Luis Rodríguez Vicente por el delito de ase-sinato en primer grado (Art. 83 del Código Penal de Puerto Rico de 1974 (33 L.P.R.A. sec. 4002)), y por el delito de posesión y uso ilegal de un arma de fuego (Art. 5.04 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 458c). Con-forme a los veredictos rendidos, el Tribunal de Primera Instancia, Sala Superior de Guayama, sentenció a Luis Ro-dríguez Vicente a 99 años de reclusión por asesinato en primer grado y a 20 años de reclusión por violación a la Ley de Armas de Puerto Rico, a ser cumplidos de manera consecutiva.
Previo a que el Jurado se retirara a deliberar, el juez que presidió los procedimientos discutió con la defensa y con el Ministerio Público las instrucciones particulares que habría de impartirles a los miembros del Jurado. La de-fensa solicitó que se impartiera, entre otras, la instrucción sobre el delito de homicidio voluntario. El Ministerio Pú-blico se opuso y el juez determinó que no era procedente la referida instrucción.
Tras rendirse los veredictos de culpabilidad en su contra, Luis Rodríguez Vicente acudió ante el Tribunal de Ape-laciones aduciendo, de manera principal, que el tribunal de instancia había errado al negarse a transmitirle al Jurado una instrucción sobre el delito de homicidio voluntario. El tribunal apelativo intermedio acogió dicho planteamiento y, en consecuencia, revocó la sentencia emitida por el tribunal de instancia y ordenó la celebración de un nuevo juicio.
*296 Inconforme, el Procurador General de Puerto Rico acu-dió —mediante un recurso de certiorari— ante este Tribunal, imputándole al foro apelativo haber incidido
... al concluir que era indispensable que se instruyera al ju-rado sobre los elementos del delito de homicidio previo a la deliberación y revocar el veredicto de culpabilidad. Petición de certiorari, pág. 7.
Expedimos el recurso. Revocamos', veamos por qué.
h-H i — I
Conforme a la prueba desfilada ante el Tribunal de Primera Instancia,(1) el domingo 18 de enero de 2004, poco después de las 2:00 p.m., Alberto Alexis Rivera Meléndez, su esposa Johana Ramos Vega y el hijo de ambos de un año y medio de edad, llegaron a su residencia sita en la ba-rriada San Cristóbal del municipio de Cayey, luego de ha-ber comprado en una tienda cercana un “kit” para brillar gomas de carro, una cerveza y unas papitas para el niño. Previo a llegar a la residencia y al pasar por un badén cercano a ésta, Alberto, quien conducía un Honda Prelude, “chilló” gomas. En la acera al otro lado de la calle, justo frente al badén, se encontraba Luis Rodríguez Vicente —también conocido como Taiwán— con unos amigos.
Al bajarse del automóvil, Taiwán increpó a Rivera Me-léndez sobre lo ocurrido. Se inició una discusión entre Taiwán y Rivera Meléndez, en la cual, posteriormente, am-bos intercambiaron golpes. Terminado el intercambio de golpes, y mientras Taiwán se dirigió a su carro, los demás individuos que acompañaban a éste se quedaron discu- *297 tiendo con Rivera Meléndez, éxpresándole que el problema era que se pasaba chillando gomas alrededor de niños, lo cual éste negó rotundamente.
Aproximadamente tres minutos después, Taiwán regresó en su carro y se bajó de éste con un bate en la mano. Taiwán entonces se acercó a Rivera Meléndez, preguntán-dole a éste “que si él le iba a tirar”. Rivera Meléndez alzó las manos y le contestó “si tú me tiraste pues yo te iba a tirar”. En ese momento, Taiwán se levantó la camisa y sacó un arma de fuego de su cintura. Rivera Meléndez comenzó a correr, alejándose del lugar y, ya de espaldas, Taiwán le hirió con tres disparos. Como consecuencia de los disparos, Rivera Meléndez cayó de pecho al suelo y, ya en el suelo, Taiwán se acercó y le hizo tres disparos más en la cabeza a Rivera Meléndez, ocasionándole la muerte.
Según surge del testimonio del médico forense, una he-rida fue en el costado izquierdo; la bala penetró la cavidad abdominal por la parte posterior y alcanzó el mesenterio, el intestino y el hígado antes de salir del cuerpo. Otra herida fue en el muslo izquierdo; la bala atravesó el muslo y al salir del cuerpo rozó el dorso del pene. Una tercera herida fue en la palma de la mano y la bala salió por la base del dedo índice. Los últimos tres impactos de bala entraron por la parte izquierda trasera de la cabeza y salieron cerca una de la otra, destrozando la parte posterior del cerebro donde se controlan funciones vitales como la respiración y los la-tidos del corazón.
HH I — I hH
 Es harto conocido en nuestra jurisdicción que las instrucciones al Jurado constituyen el mecanismo procesal mediante el cual los miembros del Jurado toman conocimiento del derecho aplicable al caso. E.L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos, Bogotá, Ed. Forum, 1992, Vol. II, pág. 330. En vista de que *298 el Jurado, de ordinario, está compuesto de personas desco-nocedoras de las normas jurídicas vigentes en nuestro or-denamiento jurídico, el magistrado que preside el proceso tiene el deber ineludible de instruir a los miembros del Jurado sobre el derecho aplicable al caso y de velar que las instrucciones impartidas sean correctas, precisas y lógicas. Pueblo v. Negrón Ayala, 171 D.P.R. 406 (2007); Pueblo v. Rosario, 160 D.P.R. 592 (2003); Pueblo v. Ortiz Martínez, 116 D.P.R. 139 (1985).
“En términos generales, el acusado tiene el derecho a que se informe al Jurado de todos los aspectos del Derecho que, según cualquier teoría razonable, pudieran ser pertinentes en las deliberaciones, aunque la prueba de defensa sea débil, [incongruente] o de dudosa credibilidad.” Pueblo v. Negrón Ayala, ante, pág. 414. Lo indispensable es que, al momento de aquilatar la prueba, el Jurado tenga a su disposición las instrucciones apropiadas, pues “[s]ólo así el veredicto será, cualquiera que fuese, uno justo”. Pueblo v. Acevedo Estrada, 150 D.P.R. 84, 95 (2000).
Entre los distintos aspectos que deben incluirse en las instrucciones al Jurado se encuentran los elementos de los delitos inferiores al imputado o comprendidos dentro de éste. Al respecto, reiteradamente hemos resuelto que sólo procederá impartir instrucciones al Jurado sobre dichos elementos cuando la prueba así lo justifique. “Esto es, una instrucción sobre delitos inferiores no le será transmitida al Jurado de forma automática, sino que es necesario que exista evidencia de la cual el Jurado pueda razonablemente inferir que el acusado es culpable del delito inferior.” Pueblo v. Rosario, ante, pág. 605. Por ser así, no incurre en error un juez que deniega una instrucción sobre un delito menor incluido cuando estima que “la evidencia, aun pudiendo ser creída por el Jurado, resulta insuficiente en derecho para establecer la comisión del referido delito”. Pueblo v. Rosario, ante, pág. 606.
*299 En el caso específico de instrucciones sobre el delito de homicidio voluntario, en un proceso por el delito de asesinato, hemos resuelto reiteradamente que procede impartir instrucciones sobre el delito de homicidio únicamente si de la prueba surge alguna evidencia que justifique un veredicto de homicidio, aun cuando ésta sea débil o escasa. Pueblo v. Negrón Ayala, ante; Pueblo v. Rosario, ante; Pueblo v. Moreno Morales I, 132 D.P.R. 261 (1992); Pueblo v. Serbiá, 75 D.P.R. 394 (1953); El Pueblo v. Alméstico, 18 D.P.R. 320 (1912). “[M]ientras haya alguna prueba pertinente a la cuestión de homicidio, la credibilidad y peso de la misma es cuestión a ser determinada por el jurado, y no una de derecho a ser resuelta por el tribunal.” Pueblo v. González Colón, 110 D.P.R. 812, 816 (1981).
No obstante, esto no implica que los tribunales estén obligados a impartir instrucciones sobre el delito de homi-cidio voluntario cuando no hay nada en la evidencia que pueda justificar tal veredicto. “A fin de cuentas, permitir que subsista la práctica de transmitir instrucciones de ho-micidio cuando los autos están huérfanos de toda evidencia que justifique tal veredicto, equivaldría a autorizar que el [j]urado imponga un castigo diferente al prescrito para el delito que de hecho se cometió.” Pueblo v. Moreno Morales I, ante, pág. 283. Véase, además, Pueblo v. Serbiá, ante.
IV
El Art. 85 del Código Penal de Puerto Rico de 1974, vigente al momento de los hechos, disponía, en lo pertinente, que comete el delito de homicidio “toda persona que matare a otra en ocasión de súbita pendencia o arrebato de cólera”. 32 L.P.R.A. see. 4004. Según se deduce del texto citado, los elementos del delito son: (1) dar muerte a un ser humano; (2) como consecuencia de una súbita pendencia o arrebato de cólera, y (3) causado por una provoca- *300 ción adecuada de parte de la víctima. Pueblo v. Cruz Correa, 121 D.P.R. 270 (1988).
Al respecto, hemos expuesto que
[e]l homicidio presupone que el autor de la muerte actuó movido por una provocación adecuada de tal naturaleza que lleve a una persona ordinaria a perder su dominio y actuar bajo impulsos mentales causados por cólera, pendencia o emo-ción violenta. ...
[S]i no existe esa provocación o si habiendo existido no es lo suficientemente grave y la actuación del matador está fuera de toda proporción con el grado de provocación, el acto de dar muerte constituye asesinato aunque el acusado no hubiese pre-concebido la idea.
De lo anterior se desprende que para determinar la posible comisión del delito de homicidio hay que identificar, al menos, tres factores. Estos son: (i) que la muerte haya ocurrido mien-tras el actor se encontraba en un arrebato de cólera o penden-cia súbita (“heat of passion”); (ii) que la muerte estuviere pre-cedida de una provocación adecuada, y (iii) que la muerte haya ocurrido antes de que el arrebato o pendencia sufrida por el actor razonablemente se hubiere enfriado (“cooling off period”). (Citas y énfasis suprimidos y énfasis nuestro.) Pueblo v. Rosario, ante, pág. 608. Véase, además, Pueblo v. Negrón Ayala, ante.
Por otro lado, el Art. 82 del Código Penal de Puerto Rico de 1974 disponía que el delito de asesinato es “dar muerte a un ser humano con malicia premeditada”. 32 L.P.R.A. see. 4001. Como es sabido, dicho delito se divide en primer y segundo grado, dependiendo de la perversidad demostrada por el acusado al momento de cometer el acto. El asesinato en primer grado requiere, aparte de la malicia premeditada, el elemento de deliberación; mientras que en el asesinato en segundo grado la muerte es maliciosa y premeditada, pero la deliberación está ausente. Pueblo v. Rosario, ante. Véase, además, Pueblo v. Negrón Ayala, ante.
Conforme con esto, hemos expresado que
*301 [l]a malicia premeditada, que es el elemento mental reque-rido en el delito genérico de asesinato, implica la ausencia de justa causa o excusa y conciencia al ocasionar la muerte de un semejante. Por otro lado, la deliberación es la resolución o de-cisión de matar, después de darle alguna consideración.
Ello no obstante, cualquier periodo de tiempo, por corto que sea, será suficiente para que pueda tener lugar la deliberación. Incluso, hemos sostenido que ese lapso puede ser tan rápido como el pensamiento. Esto es, tanto la deliberación como la malicia premeditada no requieren necesariamente un plan previo ni que se conciban con mucho tiempo de antelación a los hechos. No tiene que transcurrir determinado periodo de tiempo entre la intención de matar y la muerte misma ya que ambos elementos pueden concebirse en el momento mismo del ataque. ... [L\a premeditación y la deliberación pueden for-marse en un instante antes del acto, y pueden existir ... no obstante la rapidez con que el acto se haya realizado. (Citas omitidas, énfasis en el original y énfasis nuestro.) Pueblo v. Rosario, ante, pág. 610. Véase, además, Pueblo v. Negrón Ayala, ante.
Como es de notar, tanto la deliberación como la malicia son elementos subjetivos cuya existencia, en la mayoría de los casos, sólo podrá ser determinada mediante una inferencia razonable de los hechos. A esos efectos, este Tribunal ha reconocido varias instancias de las que fácilmente puede inferirse la existencia de malicia premeditada, deliberación, o ambas. Entre éstas: (1) el atacar a una persona con un arma mortífera; (2) atacar con un arma a una persona desarmada; (3) dispararle a la víctima en más de una ocasión a corta distancia y alcanzándola en la cara, y (4) dispararle a la víctima dos tiros con un arma de fuego y luego acercársele para dispararle tres veces más mientras le dice “para acabar contigo”. Pueblo v. Rosario, ante. Véase, además, Pueblo v. Negrón Ayala, ante.
V
Tomando en consideración el trasfondo fáctico y doctrinal antes expuesto, procedemos a resolver si procedía im-partir al Jurado una instrucción sobre el delito de homici- *302 dio voluntario. Respondemos en la negativa. Luego de un análisis objetivo y sereno de la evidencia que desfiló ante el Jurado, entendemos que el expediente se encuentra huér-fano de evidencia que justifique una instrucción sobre el delito de homicidio voluntario.
Los hechos ocurridos en el presente caso descartan por completo la posibilidad de que el Jurado hubiera podido razonablemente inferir que el acusado actuó movido por una provocación adecuada o lo suficientemente grave como para catalogar el acto de dar muerte como homicidio. Se-gún se desprende de los hechos previamente expuestos, el orden en que ocurrieron los eventos es razón suficiente para descartar la necesidad de que el juez impartiera ins-trucciones sobre el delito de homicidio. Como recordare-mos, luego de darse la discusión entre la víctima y el acu-sado y de éstos haber intercambiado unos golpes, este último se dirigió a su automóvil y no fue hasta tres minu-tos después que regresó a la escena de los hechos con un bate en la mano y el revólver en su cintura. Una vez allí, volvió a increpar a la víctima y cuando ésta comenzó a alejarse tras ser amenazada con el arma, el acusado hirió de tres balazos a la víctima. La víctima cayó al suelo, y ya en el suelo, el acusado se le acercó nuevamente y le disparó tres veces en la cabeza, ocasionándole la muerte.
Ciertamente, de estos hechos se desprende claramente que el acusado dio muerte a la víctima con la malicia pre-meditada y deliberación que tipifican el delito de asesinato en primer grado. Entre el momento en que el acusado se marchó del lugar donde ocurrió la discusión y el momento en que éste atacó a la víctima con el arma de fuego, trans-currió suficiente tiempo para que el acusado se “enfriara” de lo ocurrido en la discusión y deliberara sobre el acto de dar muerte a la víctima.
Coincidimos con el Procurador General respecto a que
el hecho de que [el acusado] pudiera alejarse de la escena de la pelea por varios minutos, para luego regresar con un arma de *303 fuego, derrota su contención de que cometió un homicidio. In-dependientemente de la súbita pendencia o arrebato de cólera que pudo haber sentido contra [la víctima], no es menos cierto que tuvo la claridad de mente [para] (1) retirarse del lugar, (2) buscar un arma, (3) retornar al lugar de la reyerta, (4) dispa-rar en contra de [la víctima], [y] (5) rematarl[a] mientras es-taba en el suelo ....
Más aún, [el acusado] no dio muerte a [la víctima] tan pronto obtuvo el arma, sino que se detuvo frente a él, le hizo una pregunta y luego de escuchar su contestación, le disparó.
[Estos] eventos antes citados requieren un análisis inteli-gente y presencia mental, derrotando cualquier reclamo de que actuó reflexivamente, motivado por sus pasiones coléricas. Alegato del Ministerio Público de 9 de mayo de 2007, págs. 26 y 28.
Dicho de otra manera, de los hechos del presente caso surgen varias instancias de las cuales —según hemos re-suelto en el pasado— puede inferirse la existencia de ma-licia premeditada, de deliberación o de ambas en la persona del acusado, lo cual fortalece nuestra conclusión de que no existe evidencia alguna de la cual el Jurado haya podido razonablemente inferir que se cometió el delito de homicidio. El acusado atacó a la víctima con un arma mor-tífera, con conocimiento de que esta última se encontraba desarmada, y le disparó un total de seis veces, los últimos tres a corta distancia, en el área de la cabeza y luego de la víctima haber caído al suelo. No se necesita más evidencia que ésta para concluir que el acusado cometió el delito de asesinato en primer grado, como, en efecto, concluyó uná-nimemente el Jurado en este caso.
En fin, consideramos que los hechos hoy ante nuestra consideración no son indicativos de una persona que actuó bajo los efectos de una súbita pendencia o arrebato de cólera. En consecuencia, actuó correctamente el juez de instancia al negarse a impartir al Jurado una instrucción sobre el delito de homicidio. Resolver lo contrario "equival-dría a autorizar que el jurado imponga un castigo diferente al prescrito para el delito que de hecho se cometió”. Pueblo *304 v. Moreno Morales I, ante, pág. 283. Véase, además, Pueblo v. Serbiá,. ante.
VI
En mérito de lo antes expuesto, procede la revocación de la sentencia emitida por el Tribunal de Apelaciones. Se reinstala la emitida por el Tribunal de Primera Instancia, mediante la cual se le impuso al acusado una pena de re-clusión por la comisión del delito de asesinato en primer grado y violación a la Ley de Armas de Puerto Rico.

Se dictará sentencia de conformidad.

El Juez Presidente Señor Hernández Denton “disintió por entender que la sentencia del Tribunal de Apelaciones es esencialmente correcta. A la luz de la prueba presen-tada, el Tribunal de Primera Instancia debió impartir la instrucción al Jurado sobre los elementos del delito de ho-micidio voluntario”. La Juez Asociada Señora Fiol Matta concurrió con el resultado sin opinión escrita.

 Ante el Tribunal de Primera Instancia se presentó el testimonio de: (1) agente Omayra Laboy Lind; (2) Nereida Meléndez, madre del occiso; (3) agente Luis A. Roque Rodríguez; (4) Johana Ramos Vega, esposa del occiso y testigo ocular de los hechos; (5) agente Alberto Giraud Vega; (6) Dr. Francisco Cortes, perito patólogo forense, y (7) Edward Pérez Benitez, examinador de armas de fuego del Instituto de Ciencias Forenses. Forman parte del expediente la exposición narrativa estipulada de la prueba y la transcripción del testimonio del agente Luis A. Roque Rodríguez.